# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

US FIRE PUMP COMPANY, LLC                        CIVIL ACTION

VERSUS                                            19-335-SDD-EWD

ALERT DISASTER CONTROL (MIDDLE
EAST) LTD., ET AL.

## <u>RULING</u>

Before the Court is a *Motion to Dismiss*[1] under Rule 12(b)(2) and Rule 12(b)(5) and a *Motion for Partial Dismissal*[2] under Rule 12(b)(6) filed by Alert Disaster Control (Asia) PTE. Ltd ("Alert Asia"), Alert Disaster Control (Middle East) Ltd. ("Alert Middle East"), and Michael E. Allcorn ("Allcorn") (collectively, "Defendants"). US Fire Pump Company, LLC ("Plaintiff") filed an *Opposition*[3] to each *Motion*, to which Defendants filed two *Replies*.[4] For the following reasons, Defendants' *Motion to Dismiss*[5] under Rule 12(b)(2) and Rule 12(b)(5) shall be DENIED, and Defendants' *Motion for Partial Dismissal*[6] under Rule 12(b)(6) shall be GRANTED in part and DENIED in part.

## I.   BACKGROUND

This is at core a breach of contract case. However, Plaintiff brings several causes of action against three foreign defendants with different citizenships and asserts a veil

---

[1] Rec. Doc. No. 44.
[2] Rec. Doc. No. 45. Despite being styled a "Motion for Partial Dismissal" Defendants' requested relief is dismissal of the entire *Amended Complaint*. Rec. Doc. No. 45-1, p. 8.
[3] Rec. Doc. No. 46; Rec. Doc. No. 47.
[4] Rec. Doc. No. 52; Rec. Doc. No. 53.
[5] Rec. Doc. No. 44.
[6] Rec. Doc. No. 45.

1

piercing theory. The Court will provide the following summary of the salient facts in this complex dispute.

## A. The Parties

Plaintiff is an LLC whose sole member is Louisiana domiciliary Christopher Ferrara ("Ferrara").[7] Plaintiff is a provider of "industrial fire solutions" and a manufacturer of firefighting systems operated in Holden, Louisiana.[8] Alert Middle East is a company incorporated in Cyprus with its "place of business in the United Arab Emirates and other locations outside of the United States."[9] Alert Asia is a company organized in Singapore with its principal place of business in Singapore.[10] Both Alert companies are engaged in emergency response and risk management, with an emphasis on "oilfield firefighting and blowout control, well control engineering and project management, marine and industrial firefighting, hazardous material control, integrated QHSE management, safety and survival training, toxic environment protection, and fire and safety OEM and product sales."[11] Allcorn is the common tie between these companies, allegedly serving as sole shareholder and operator of each.[12] Allcorn is also, by his own admission, the managing director of each company.[13] Allcorn is a permanent resident of Singapore, and a registered resident of the UAE.[14]

---

[7] Rec. Doc. No. 38, p. 1
[8] *Id.* at p. 12.
[9] Rec. Doc. No. 44-2, p. 2.
[10] *Id.*
[11] Rec. Doc. No. 38, p. 5 (cleaned up).
[12] *Id.* at pp. 4–5; Rec. Doc. No. 46-4, p. 2; Rec. Doc. No. 46-3, p. 1.
[13] Rec. Doc. No. 44-2, pp. 1–2.
[14] *Id.* at p. 3.

**B.  Facts Alleged**

Plaintiff and Alert Middle East, via Allcorn, began negotiations on December 5, 2018, for Plaintiff to sell firefighting equipment to Alert Middle East.[15] Who initiated contact is a matter of dispute. Plaintiff alleges that Allcorn and Plaintiff traded a flurry of emails, phone calls, and text messages over several months related to specifications for the equipment, pricing, payment terms, and delivery.[16] Although Plaintiff tendered several contracts, the parties never executed one. Plaintiff alleges that a contract formed through communications which evidence offer and acceptance. In sum, beginning in December 2018 and into February 2019, Alert Middle East, via Allcorn, allegedly agreed to purchase more than $3.4 million in materials and equipment from Plaintiff.[17]

On January 10, 2019, Plaintiff contacted Alert Middle East to inquire about payment.[18] On January 29, 2019, Alert Middle East, via Allcorn, emailed an assurance of future payment.[19] Plaintiff alleges that no payment has been made despite multiple demands.[20] Plaintiff filed suit on May 29, 2019, claiming breach of contract, bad faith breach of contract, fraud, a violation of the Louisiana Unfair Trade Practices Act ("LUTPA"), and failure to pay on an open account.[21] Plaintiff seeks specific performance and damages, including interest, costs, lost profits, incidental damages, court costs, attorney fees, and treble damages.[22]

---

[15] Rec. Doc. No. 38, p. 13.
[16] *Id.* at pp. 13–29.
[17] *Id.* at p. 11.
[18] Rec. Doc. No. 38, pp. 27–28; Rec. Doc. No. 38-5.
[19] Rec. Doc. No. 38, pp. 27–28.
[20] *Id.* at pp. 28–29.
[21] *Id.* at pp. 30–47.
[22] *Id.* at pp. 48–49.

3

## II.    LAW AND ANALYSIS

Subject matter jurisdiction is based on diversity of citizenship. Defendants challenge personal jurisdiction under Rule 12(b)(2) and allege improper service of process under Rule 12(b)(5); Defendants also move to dismiss under Rule 12(b)(6).

### A.  Personal Jurisdiction: Rule 12(b)(2) Motion to Dismiss

Plaintiff asserts that the Court has specific personal jurisdiction over Alert Middle East and Allcorn for both its contractual and tortious causes of action.[23] Plaintiff argues that Allcorn and Alert Middle East's contacts can be imputed to Alert Asia for the purpose of personal jurisdiction under a single business enterprise theory.[24]

A federal district court sitting in diversity may exercise personal jurisdiction over a foreign defendant if: (1) the long-arm statute of the forum state enables personal jurisdiction over the defendant, and (2) the exercise of personal jurisdiction is consistent with the Due Process Clause. The due process and long-arm statute inquiries merge because Louisiana's long-arm statute extends jurisdiction coextensively with the limits of the Due Process Clause.[25]

A court may exercise specific jurisdiction[26] in conformity with due process "in a suit arising out of or related to the defendant's contacts with the forum"[27] when the "'nonresident defendant has purposefully directed its activities at the forum state and the

---

[23] Plaintiff argues that the minimum contacts test differs depending on the theory of liability. Rec. Doc. No. 46, pp. 11–16.

[24] *Id.* at. pp. 16–18.

[25] *Petroleum Helicopters, Inc. v. Avco Corporation*, 834 F.2d 510, 512 (5th Cir.1987).

[26] Plaintiff does not allege general jurisdiction.

[27] *Luv N' Care, Ltd., v. Insta–Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (internal citations omitted).

4

litigation results from alleged injuries that arise out of or relate to those activities.'"[28] The Fifth Circuit follows a three-step analysis for specific personal jurisdiction. First, a court must determine "whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there."[29] The "'purposeful availment' must be such that the defendant 'should reasonably anticipate being haled into court' in the forum state."[30] Second, a court considers "whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts."[31] Third, "[e]ven if minimum contacts exist, the exercise of personal jurisdiction over a non-resident defendant will fail to satisfy due process requirements if the assertion of jurisdiction offends traditional notions of fair play and substantial justice."[32]

"When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the court's jurisdiction over the nonresident."[33] When a district court rules on a motion to dismiss without an evidentiary hearing, the plaintiff need only present a *prima facie* case of personal jurisdiction.[34] At this stage, uncontroverted allegations in the complaint must be taken as true, and conflicts

---

[28] *Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo.*, 615 F.3d 364, 368 (5th Cir. 2010) (quoting *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 243 (5th Cir.2008)).

[29] *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006).

[30] *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 419 (5th Cir. 1993) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). *See also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 ("This 'purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts.") (citations omitted); *In re Chinese Manufactured Drywall Products Liability Litigation*, 742 F.3d 576, 588 (5th Cir. 2014).

[31] *Seiferth*, 472 F.3d at 271.

[32] *Ruston Gas Turbines*, 9 F.3d at 421 (internal citations omitted).

[33] *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985).

[34] *Trinity Indus., Inc. v. Myers & Assoc., Ltd.*, 41 F.3d 229, 230–31 (5th Cir. 1995).

5

between the parties' affidavits must be resolved in the plaintiff's favor.[35] To aid resolution of the jurisdictional issue, a court "may receive interrogatories, depositions or any combination of the recognized methods of discovery . . . . But even if the court receives discovery materials, unless there is a full and fair hearing, it should not act as a fact finder and must construe all disputed facts in the plaintiff's favor and consider them along with the undisputed facts."[36] "When deciding a motion to dismiss for lack of personal jurisdiction, the court is not limited to considering the facts pleaded in the complaint."[37]

### 1. Allcorn/Alert Middle East's Contacts with Louisiana

The starting point of the fact-intensive analysis is Allcorn/Alert Middle East's contacts with Louisiana. Plaintiff asserts Allcorn contacted it first.[38] Defendants assert that Plaintiff contacted them first because Plaintiff's agent in the UAE, Emergency Safety Solutions ("ESS"), contacted Defendants first.[39] Defendants cite to the affidavit of David Jackson, Managing Director of ESS.[40] Jackson attests that on December 5, 2018, he provided Alert Middle East with Plaintiff's contact information and asked Alert Middle East to reach out to Plaintiff as a potential customer.[41] Jackson also notified Plaintiff of the potential sales opportunity.[42] Alert Middle East, via Allcorn, contacted Plaintiff on the

---

[35] *D.J. Inv., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 546 (5th Cir. 1985).
[36] *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241–42 (5th Cir. 2008) (holding that the district court erred in requiring a plaintiff to establish more than a *prima facie* case even after a limited pretrial evidentiary hearing) (internal citations and quotations omitted).
[37] *Id.*
[38] Rec. Doc. No. 46, p. 11; Rec. Doc. No. 38, p. 13.
[39] Rec. Doc. No. 44-1, p. 5–6.
[40] *Id*; Rec. Doc. No. 44-3.
[41] Rec. Doc. No. 44-3, p. 2.
[42] *Id.*

same day.[43] So while Plaintiff's agent initially contacted Alert Middle East, Alert Middle East then took the next step to contact Plaintiff directly.

From there, the parties began exchanging emails, phone calls, and text messages. The substantive emails began on December 5, 2018, when Allcorn acknowledged that the parties had spoken on the phone earlier that day and requested quotes for several items.[44] Later that day, Plaintiff's representative sent Allcorn a quote.[45] The following day, December 6, Allcorn sent an additional email acknowledging that another phone call had occurred and "confirm[ing] [Alert Middle East's] interest in the immediate purchase of the following. . . ."[46] Plaintiff's representative responded with an updated proposal and draft contract.[47] Plaintiff alleges that this contract provided for Louisiana choice of law and F.O.B. Holden, Louisiana.[48] However, Defendants did not sign this or any other contract.

On the following day, December 7, Allcorn sent one email with pictures of Defendants'[49] current equipment[50] and one email acknowledging a phone call that had occurred that day and providing a timeline for Allcorn/Alert Middle East's payment to Plaintiff.[51] Plaintiff's representative emailed Allcorn that night requesting that Allcorn sign

---

[43] *Id* at p. 3. Defendants introduced David Jackson's affidavit into the record. See also, Rec. Doc. No. 38-11, p. 2.

[44] Rec. Doc. No. 38-1, p. 1; The first email in the chain is from David Jackson of ESS to Allcorn with Plaintiff's staff cc'd directing Allcorn to contact those staff members regarding pricing and delivery. One hour and twenty-six minutes later, Allcorn sent his first email to Plaintiff.

[45] *Id.* at p. 5.

[46] *Id.* at p. 7. "Further to our call earlier this evening . . ." *Id.*

[47] *Id.* at pp. 11–15. Which bound Allcorn personally.

[48] *Id.*

[49] The Court uses the term "Defendants" loosely. The pictures depict "Alert" pumps and monitors but do not indicate which Alert company they belong to.

[50] Presumably so that Plaintiff knew exactly what Defendants wanted.

[51] Rec. Doc. No. 38-1, p. 16.

7

and return the proposal and contract or ask for revisions.[52]

On the following day, December 8, Allcorn responded to the previous email and indicated that Allcorn/Alert Middle East would sign the contract if the reference to ENOC[53] was removed and the client name was amended to Alert Middle East—instead of Alert Asia and Allcorn as it had been written.[54] In the same email, Allcorn requested preferential pricing and indicated that "we wish to establish a long-term relationship between ALERT – US Fire Pump."[55] On the same day, Allcorn sent another email with 32 pictures of Alert equipment for reference.[56] Plaintiff's representative responded with a revised contract in conformance with Allcorn's request.[57]

On December 10, Plaintiff's representative sent Allcorn an email that acknowledged an earlier conference call, scheduled another call, and attached another revised quotation and contract.[58] Allcorn responded, acknowledged receipt of the quotation and contract, and stated, "[t]he revised Service Quotation and Contract shall be duly signed, scanned, and returned to you immediately upon our arrival at the office in the morning."[59] Allcorn also sent an email that day with a copy of the ENOC–Alert Middle East contract.[60]

On December 17, Plaintiff's representative emailed Allcorn the invoices.[61] Allcorn

---

[52] *Id.* at p. 25.
[53] The Emirates National Oil Company.
[54] *Id.* at p. 26.
[55] *Id.*
[56] *Id.* at p. 28.
[57] *Id.* at pp. 67–72.
[58] *Id.* at p. 73.
[59] *Id.* at p. 79.
[60] Rec. Doc. No. 38-15, pp. 1–19.
[61] Rec. Doc. No. 38-2, pp. 1–6.

8

responded, requesting a correction to one field, but otherwise "confirmed the invoices as presented."[62] The following day, December 18, Allcorn confirmed receipt of the amended proposals via email.[63] From there things deteriorated.

On January 28, 2019, Allcorn confirmed "receipt of the requested photographs" of the equipment Plaintiff built and asked for more pictures of other equipment.[64] On the following day, January 29, Allcorn confirmed receipt of the additional pictures.[65] On one occasion in February 2019, Allcorn sent Plaintiff's representative a text message.[66] Finally, Ferrara attests to Allcorn attending telephone conferences, sending emails and text messages, and calling Plaintiff.[67]

### 2. Personal Jurisdiction Analysis for Allcorn and Alert Middle East

Plaintiff argues that this Court has personal jurisdiction over Alert Middle East for the contract claims.[68] Plaintiff appears to argue that this Court has personal jurisdiction over Allcorn personally for the contract claims and briefs personal jurisdiction over Allcorn/Alert Middle East jointly.[69] However, "jurisdiction over individual officers and employees of a corporation may not be predicated merely upon jurisdiction over the corporation itself."[70] "When dealing with corporate officers, a court must look to the

---

[62] *Id.* at p. 6.
[63] *Id.* at p. 16.
[64] Rec. Doc. No. 38-3, p. 16. This is indicative of there having been a phone call or some other communication prior. Rec. Doc. No. 47, p. 16.
[65] *Id.* at p. 15.
[66] Rec. Doc. No. 38-6, pp. 1–6.
[67] Rec. Doc. No. 38-11, pp. 1–4.
[68] Rec. Doc. No. 46, pp. 11–18.
[69] *Id.* at p. 11. Plaintiff's heading reads, "1. Sufficient Minimum Contacts: Contract Claims v. Alert Middle East, Allcorn".
[70] *Escoto v. U.S. Lending Corp.*, 95-2692 (La. App. 4 Cir. 5/22/96), 675 So. 2d 741, 745, *writ denied*, 96-1634 (La. 9/27/96), 679 So. 2d 1343 (quoting *Cobb Industries, Inc. v. Hight*, 469 So.2d 1060, 1063 (La. App. 2nd Cir.1985)).

9

individual and personal contacts, if any, of the officer or employee, with the forum state."[71] This analysis applies to Allcorn because he is the managing director of Alert Middle East.[72]

Under Louisiana law, the Court can impute Alert Middle East's contacts to Allcorn. In *Fryar v. Westside Habilitation Center*, the Louisiana Supreme Court held that the exercise of personal jurisdiction over a bank officer was appropriate because: (1) the bank officer was the only officer involved in the transaction, (2) the officer was responsible for the bank's commitments in the contract, and (3) the officer had a duty to see that the bank's obligations were carried out.[73] The supreme court held, "[a]n employee cannot shield himself behind a corporate wall when he is the officer responsible for the corporation's acts in a particular transaction."[74] Plaintiff alleges, and Defendants do not controvert, that Allcorn is the only director and shareholder of Alert Middle East.[75] Thus, assuming Alert Middle East had an obligation, the execution of that obligation was solely contingent on the will of its only director—Allcorn. If the Court has personal jurisdiction over Alert Middle East for the contractual claims, the Court has personal jurisdiction over Allcorn. Because the only contacts that Plaintiff alleges were contacts by Allcorn on behalf of Alert Middle East, the minimum contacts portion of the analysis merges for the two.

The unchallenged email chain that Plaintiff introduced of the communications indicates that Allcorn negotiated delivery terms, pricing terms, types of equipment, and

---

[71] *Id.*
[72] Rec. Doc. No. 44-2, p. 1.
[73] *Fryar v. Westside Habilitation Ctr.*, 479 So. 2d 883, 890 (La. 1985).
[74] *Id.*
[75] Rec. Doc. No. 46-3, p. 1; Rec. Doc. No. 44-2, p. 1; Rec. Doc. No. 38, p. 4.

other contractual terms. The email chain also demonstrates that Allcorn knew or should have known that each of those communications were being directed to a Louisiana company at the latest on December 5, 2018—the same day negotiations started—because the quotation sent that day listed Plaintiff's Holden, Louisiana address.[76] Ferrara attests that Allcorn agreed to the terms and price of the contract and agreed that one existed,[77] and Allcorn attests to precisely the opposite;[78] however, conflicts in affidavits are settled in favor of the plaintiff at the 12(b)(2) stage.[79] The email chain shows that Allcorn agreed to sign the written contract and confirmed the accuracy of the invoices, but in any event did not memorialize those understandings in writing via a contract.[80] The question is: are the above contacts sufficient under the Due Process Clause for this Court to exercise specific jurisdiction over Allcorn/Alert Middle East?

The Court finds in the affirmative. Defendants argue that the Court does not have specific personal jurisdiction because the present case is based on "an isolated sales transaction between a resident seller and a non-resident buyer."[81] Defendants rely almost exclusively on *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.* for the proposition that a "single, isolated transaction" is insufficient for specific personal jurisdiction.[82] Defendants also argue that Plaintiff made the initial overture (through ESS, Plaintiff's agent), and there was no executed contract, so there are not minimum contacts.

---

[76] Rec. Doc. No. 38-1, p. 6.
[77] Rec. Doc. No. 38-11, p. 2.
[78] Rec. Doc. No. 44-2, p. 1.
[79] *D.J. Inv., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 546 (5th Cir.1985).
[80] Rec. Doc. No. 38-2, pp. 1–6; Rec. Doc. No. 38-1, p. 79.
[81] Rec. Doc. No. 44-1, p. 8.
[82] 700 F.2d 1026 (5th Cir. 1983); Rec. Doc. No. 44-1 pp. 8–11.

11

63780

In response, Plaintiff—who bears the burden of proving jurisdiction—argues that minimum contacts exist because: there was prolonged contact between the parties; the unsigned contracts and documents provided for Louisiana choice of law and F.O.B. Holden, Louisiana; Allcorn/Alert Middle East knew that Plaintiff would perform entirely in Louisiana; and Allcorn/Alert Middle East exerted "significant control" over Plaintiff's assembly of the equipment.[83] Plaintiff argues that the factors that Defendants cite are not determinative and provide some authority to that effect

*Hydrokinetics* is distinguishable. The defendant, Alaska Mechanical, was approached by an agent of the plaintiff, Hydrokinetics, who communicated that Hydrokinetics was interested in supplying Alaska Winter with equipment for an upcoming project.[84] Alaska Mechanical and the agent negotiated some of the contract, then the parties themselves communicated by telephone, letter, and telex (a predecessor of the fax machine).[85] Two of Alaska Mechanical's officers visited Hydrokinetics' plant in Texas.[86] The signed contract provided that Hydrokinetics would build the equipment in Texas and deliver it to Washington.[87] Importantly, the contract also contained an Alaska choice of law clause.[88] Alaska Mechanical did not like the goods for whatever reason and refused to pay for them. Hydrokinetics sued in federal court in Texas.

The Fifth Circuit concluded there were not minimum contacts. After noting that the number of contacts was not determinative and that the heart of the issue was whether

---

[83] Rec. Doc. No. 46, pp. 10–15.
[84] 700 F.2d 1027 (5th Cir. 1983).
[85] *Id.* at 1027–1029.
[86] *Id.*
[87] *Id.*
[88] *Id.*

12

Alaska Mechanical had purposefully availed itself of the benefits of Texas,[89] the court went on to describe as important the facts that: Hydrokinetics' agent initiated contact and started the negotiations, the contract contained an Alaska choice of law clause, and delivery was made in Washington—not Texas.[90] The court also found it important that Alaska Mechanical's only performance in Texas under the contract was payment.[91] The court noted that the exchange of communications between the parties was insufficient to establish minimum contacts.[92] In distinguishing the cases Hydrokinetics cited, the court noted that the inclusion of the Alaska choice of law clause made it less foreseeable that Alaska Mechanical could be haled into Texas.[93] The court also emphasized that Alaska Mechanical did not have to do an "integral, essential portion" of its performance in Texas.[94]

The facts in this case are dissimilar, but the legal principles articulated in *Hydrokinetics* inform the Court's analysis. Plaintiff's agent did not begin the negotiations; rather, Plaintiff's agent gave Alert Middle East, via Allcorn, Plaintiff's contact information, and Allcorn/Alert Middle East made the decision to reach out.[95] The initial substantive

---

[89] "Considerations such as the quality, nature, and extent of the activity in the forum, the foreseeability of consequences within the forum from activities outside it, and the relationship between the cause of action and the contacts, relate to whether to can be said that the defendant's actions constitute 'purposeful ailment.'" *Id.*

[90] *Id.* at 1028–30.

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.* The court was distinguishing *Product Promotions, Inc. v. Cousteau* 495 F.2d 483 (5th Cir.1974) wherein the nonresident defendant had to deliver the product in the forum state, and the court concluded that sufficed to establish minimum contacts.

[95] Rec. Doc. No. 44-3, pp. 1–3. Defendants argue that because Plaintiff's agent made the first contact, Plaintiff made first contact. Defendants provide no support for this assertion, and while the Court is cognizant that to some extent the actions of an agent within the scope of his authority are imputed to the principal, application of that legal fiction in the instant case ignores the undisputed fact that ESS contacted

13

contact was made by Allcorn on behalf of Alert Middle East. Like the defendant in *Hydrokinetics*, Allcorn/Alert Middle East did not perform in Louisiana. However, Plaintiff alleges that Allcorn/Alert Middle East agreed to perform in Louisiana with F.O.B in Holden and payment in Louisiana.[96] The portions of the email chain where Allcorn agrees to sign the contract and confirms that the invoices are accurate lend credence to Plaintiff's allegation. The *Hydrokinetics* court emphasized the contract's Alaska choice of law clause because the clause decreased the foreseeability that the defendant would be haled into a Texas court.[97]

Foreseeability is a part of the purposeful availment portion of the specific jurisdiction test. In *World-Wide Volkswagen Corp. v. Woodson*, the United States Supreme Court held that "the foreseeability that is critical to the due process analysis ... is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there."[98] The foreseeability element informs the purposeful availment analysis in that courts must ask: given the extent that the nonresident availed itself of the privileges and benefits of the laws of the forum state, should the nonresident have foreseen being haled into court there?[99] In other words, are the contacts with the forum state of such a number, nature, and degree that the

---

Defendants, then Defendants contacted Plaintiff. Absent a showing that Plaintiff explicitly directed ESS to contact Defendants, the Court is not willing to accept that Plaintiff's agent's contact of Defendants, apparently unbeknownst to Plaintiff, has the same legal effect as Plaintiff contacting Defendants directly.

[96] Rec. Doc. No. 44-3, p. 2. The Court "must resolve all undisputed facts submitted by the plaintiff, as well as all facts contested in the affidavits, in favor of jurisdiction." *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006).

[97] *Hydrokinetics*, 700 F.2d at 1030.

[98] 444 U.S. 286, 297 (1980).

[99] *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 227–29 (5th Cir. 2012).

63780

nonresident defendant should have foreseen that those contacts rendered it amenable to suit in that jurisdiction?

> The objective of the purposeful availment requirement is to provide predictability and give notice to the defendant that it is subject to suit in the forum state, so that the company can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State.[100]

"The purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts."[101]

Plaintiff relies on another Fifth Circuit case, *Mississippi Interstate Exp., Inc. v. Transpo, Inc.*, and a plethora of district court cases.[102] *Mississippi Interstate* is factually distinguishable, but the principles articulated therein shape the Court's analysis. The plaintiff was a Mississippi trucking company who sued several California citizens.[103] The plaintiff initiated contact with one of the defendants which led to an oral agreement that the plaintiff would supply trucks to move goods for the defendant.[104] Over the next two months, the defendant called the plaintiff's headquarters in Mississippi at least 19 times ordering 19 shipments.[105] There was no discussion as to where payment was to be made, but the court noted that the invoices directed payment in Mississippi, as the parties "reasonably contemplated."[106] *Mississippi Interstate* is distinguishable because of the number of shipments (19), whereas in this case all of the communications related to one

---

[100] *Id.* at 228 (internal citations omitted).
[101] *Id.* (internal citations omitted).
[102] 681 F.2d 1003 (5th Cir. 1982); Rec. Doc. No. 46, pp. 21–22.
[103] *Id.* at 1004.
[104] *Id.* at 1005.
[105] *Id.*
[106] *Id.*

63780

order.

In concluding that the exercise of jurisdiction was appropriate, the court stated some basic principles relevant here. First, "[t]he rule developed by this circuit, however, is that when a nonresident defendant takes 'purposeful and affirmative action,' the effect of which is 'to cause business activity, foreseeable by [the defendant] in the forum state,' such action by the defendant is considered a 'minimum contact' for jurisdictional purposes."[107] The court went on to say that the defendant, by contracting with the Mississippi plaintiff, purposefully availed itself of the privilege of conducting activities within Mississippi if it was "reasonably foreseeable that [the plaintiff] would in fact perform a material part of its contractual obligations within the forum state."[108] The court continued its analysis by noting that the defendant was no "mere passive customer."[109] Instead, the defendant exercised a "significant measure of control" over the details of each shipment.[110] Furthermore, "the relationship between the parties was sustained (not 'single' or 'fortuitous'), and the plaintiff performed its part of the undertaking at its sole place of business in Mississippi as was known to the California defendants at the outset of their relations."[111]

Plaintiff argues that Allcorn/Alert Middle East knew that Plaintiff would perform all of its obligations in Louisiana.[112] The email chain supports that conclusion because the

---

[107] *Id.* at 1007 (quoting *Marathon Metallic Building Co. v. Mountain Empire Construction Co.*, 653 F.2d 921, 923 (5th Cir. 1981)). See also, *Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 382 (5th Cir. 2003).
[108] *Mississippi Interstate*, 681 F. 2d at 1008.
[109] *Id.* at 1009.
[110] *Id.*
[111] *Id.*
[112] Rec. Doc. No. 46, p. 7.

16

quotation sent to Allcorn/Alert Middle East on December 5 (the first day of contact between the parties), listed Plaintiff's Louisiana address.[113] However, as Defendants point out, the bulk of the price of the order came from the delivery of firefighting foam from Spain.[114] This ignores Plaintiff's allegation that there was still over $1 million worth of the order that would be performed in Louisiana,[115] and, moreover, even if the firefighting foam would ship from Spain, that does not mean that Plaintiff performed all of its obligations related to the foam in Spain. On the contrary, accepting Plaintiff's well-pleaded facts as true and construing the jurisdictional evidence in the light most favorable to Plaintiff, Plaintiff acted from Louisiana to organize the delivery of the foam from Spain. The source of a portion of the goods does not control the analysis and does not change the fact that a "material part" of Plaintiff's performance (building the equipment that Alert Middle East ordered) occurred in Louisiana. The Court therefore finds that Plaintiff has supported the allegation that Allcorn/Alert Middle East knew from the outset that a "material part" of Plaintiff's performance would occur in Louisiana. By the same token, Allcorn/Alert Middle East took "purposeful and affirmative action" to request the production of certain equipment in Louisiana, which was business activity within Louisiana foreseeable to Allcorn/Alert Middle East.

Moreover, Plaintiff has alleged that Allcorn/Alert Middle East were not "mere passive customers." The email chain and Ferrara's affidavit, accepted as true,

---

[113] Rec. Doc. No 38-1, p. 6.
[114] Rec. Doc. No. 53, p. 5. Its unclear exactly what the relationship between the Spanish manufacturer and Plaintiff is, but the invoices and email chain indicate that the foam in Spain was to be purchased from Plaintiff.
[115] Rec. Doc. No. 38-2, pp. 2–5.

demonstrate near daily communications regarding the specifics of the order, including Allcorn/Alert Middle East adding additional equipment to the order and sending and requesting photographs which guided production in Louisiana. While the majority of the communications took place over a relatively short period of a couple of weeks in December, the flurry of communications during that time, coupled with the fact that Allcorn/Alert Middle East made their intentions clear as to a long term relationship, leads inexorably to the conclusion that this transaction was not a "fortuitous" event. To be sure, there was one "single" transaction, but it took place over the span of weeks and involved near constant communication between the parties. Application of the principles of *Mississippi Interstate* yields the conclusion that Allcorn/Alert Middle East purposefully availed themselves of the benefits and privileges of doing business in Louisiana.

The foreseeability aspect of the purposeful availment analysis buttresses this conclusion. Plaintiff alleges that from the outset of the negotiations, Allcorn/Alert Middle East knew they were contracting with a Louisiana company. And, while Alert Middle East did not sign the contracts providing for F.O.B. Holden and choice of law Louisiana, it (via Allcorn) agreed to sign and presumably read them.[116] While Allcorn/Alert Middle East may not be bound by those contracts, the terms of the contracts put Allcorn/Alert Middle East on notice that if litigation were to occur in relation to the contracts, Louisiana law would apply. This, coupled with Plaintiff's well-pleaded allegation that Allcorn/Alert Middle East knew that they were contracting with a Louisiana company whose performance would primarily be in Louisiana, made it foreseeable to Allcorn/Alert Middle East that they could

---

[116] Rec. Doc. No. 38-2, pp. 1–6; Rec. Doc. No. 38-1, p. 79.

be haled into court in Louisiana. Because Allcorn/Alert Middle East purposefully availed itself of the privilege of doing business in Louisiana, Allcorn/Alert Middle East has minimum contacts with Louisiana.

The remainder of the specific personal jurisdiction analysis requires consideration of (1) "whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts,"[117] and (2) whether "the exercise of personal jurisdiction over a non-resident defendant [fails] to satisfy due process requirements [because] the assertion of jurisdiction offends 'traditional notions of fair play and substantial justice.'"[118] Allcorn/Alert Middle East's contacts with Louisiana led to the business dealings between the parties. As such, the Court has no trouble concluding that "plaintiff's cause of action arises out of or results from the defendant's forum-related contacts…"[119]

It remains to be determined whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. This requires the Court to consider "(1) the defendant's burden, (2) the forum state's interests, (3) the plaintiff's interest in convenient and effective relief, (4) the judicial system's interest in efficient resolution of controversies, and (5) the state's shared interest in furthering fundamental social policies."[120] "It is rare to say the assertion [of jurisdiction] is unfair after minimum contacts have been shown."[121]

---

[117] *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002).
[118] *Ruston Gas Turbines*, 9 F.3d at 421 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).
[119] *Nuovo Pignone*, 310 F.3d at 378.
[120] *Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 814 (5th Cir. 2006) (citing *Ruston Gas Turbines*, 9 F.3d at 421).
[121] *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 615 (5th Cir. 2008) (citing *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)).

19

Defendants argue that the assertion of jurisdiction offends traditional notions of fair play and substantial justice because (1) "the burdens on Defendants are extreme since, they are overseas parties with no Louisiana connection"; (2) "Louisiana has no special interest [because] Plaintiff willingly explored an overseas business opportunity with no connection to Louisiana"; (3) "Plaintiff may pursue its remedy against Defendants where they are located"; and (4) "this is a simple breach of contract case relating to an overseas project (and best addressed overseas), and no interests are triggered to favor maintaining the case in Louisiana."[122] Defendants do not provide different reasons for Allcorn and Alert Middle East.

As to Defendants' first argument, they have one connection to Louisiana—the business negotiations which gave rise to this suit—which the Court has already determined establish minimum contacts. Also, the fact that Defendants are located overseas is not a reprieve from the exercise of jurisdiction by American courts.

As to Defendants' second and fourth arguments, Louisiana has an interest in establishing the rights of its corporate citizen. Similarly, it does not matter that the final destination of the goods was overseas because the majority of Plaintiff's alleged obligations were to be performed in Louisiana, and Defendants' alleged duty to pay was to be performed in Louisiana. Defendants characterization of the dealings between the parties as "an overseas project" and an "overseas business opportunity" is inaccurate insofar as substantial performance was contemplated and foreseeable in Louisiana.

As to Defendant's third argument, it implicitly contradicts its first. But more to the

---

[122] Rec. Doc. No. 44-1, p. 12.

point, it does not matter whether Plaintiff can sue Defendants where they are located. The availability of a foreign forum does not diminish or negate personal jurisdiction in a local forum.

In sum, the Court finds that Plaintiff has established that Allcorn/Alert Middle East have sufficient minimum contacts such that the Court's exercise of jurisdiction comports with Due Process, Plaintiff's causes of action arise from those contacts, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice.

Having concluded that the Court may exercise personal jurisdiction over Allcorn and Alert Middle East for Plaintiff's contract theory of liability, the Court need not consider whether those same contacts give rise to personal jurisdiction for Plaintiff's tort theories. The Fifth Circuit in *Seiferth v Helicopteros Atuneros, Inc.*[123] held that a "plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim."[124] The court came to that conclusion because "[i]f a defendant does not have enough contacts to justify the exercise of personal jurisdiction, the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts."[125] In other words, the court restated the truism that the claim must arise out of the defendant's contacts.

The instant case is inapposite. Allcorn/Alert Middle East's contacts with Louisiana that give rise to the contractual claims are the same contacts that give rise to the tortious claims. The Court has already concluded that the contacts are sufficient to exercise

---

[123] 472 F.3d 266 (5th Cir. 2006).
[124] *Id.* at 274.
[125] *Id.* at 275.

21

jurisdiction and need not do so again simply because Plaintiff seeks recovery based on different theories of liability.[126] "This is consistent with the general principle that jurisdiction is properly asserted over claims when the *contacts* meet the minimum contact standard."[127]

### 3. *Jurisdictional Veil Piercing as to Alert Asia*

Plaintiff asserts that the Court has specific jurisdiction over Alert Asia by virtue of its connection with Allcorn/Alert Middle East under a single business enterprise theory.[128] Defendants counter that Plaintiff must make that showing under foreign law—not Louisiana law.[129] Plaintiff does not rebut that assertion, and Defendants do not explain what foreign law is applicable. For the following reasons, the Court concludes that Louisiana law applies to the imputation of contacts for the jurisdictional analysis.[130]

Defendants cite *In re Chinese-Manufactured Drywall Products Liability Litigation*[131] in support of their contention that Plaintiff's showing is under foreign law.[132] The court in that case had to determine whether to apply the law of the forum

---

[126] *Opti-Com Mfg. Network, LLC v. Champion Fiberglass, Inc.*, No. CV 18-9647, 2019 WL 1904894, at *6 (E.D. La. Apr. 29, 2019).

[127] *Sutton v. Advanced Aquaculture Sys., Inc.*, 621 F. Supp. 2d 435, 442 (W.D. Tex. 2007) (emphasis in original). The Fifth Circuit held in *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999) that "[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." Plaintiff relies on this principle to support its argument that the Court has personal jurisdiction over Allcorn/Alert Middle East under a tortious theory of minimum contacts. Plaintiff is correct, given the conclusion below that Plaintiff has adequately pled a claim for fraudulent inducement.

[128] Rec. Doc. No. 46, pp. 16–19.

[129] Rec. Doc. No. 44-1, p. 13.

[130] But foreign law applies to the substantive issue of whether Allcorn/Alert Middle East's potential liabilities can be imputed to Alert Asia under a single business enterprise theory.

[131] 2017 WL 1476595, (E.D. L.A. 2017).

[132] Rec. Doc. No. 44-1, p. 13.

63780

state (Louisiana) or the law of the state of the defendant's incorporation (China) to the imputation of contacts question. The court quoted the Fifth Circuit[133] for the contention that, "under Louisiana law, 'the law of the state of incorporation governs the determination when to pierce the corporate veil.'"[134] With that, the court concluded that Chinese law applied.[135]

The Fifth Circuit, however, has not answered whether the choice of law analysis for imputation of contacts for the purposes of personal jurisdiction is the same as the analysis for liability based on veil piercing.[136] Instead, the Fifth Circuit characterized this "complicated choice of law question" as an "open issue."[137] Under Defendants' interpretation, the Court would apply foreign law because the Alert companies are not incorporated in the United States. Plaintiff argues in favor of the application of Louisiana law.

Fed. R. Civ. P. 4(k)(1) provides that a federal court's jurisdiction is determined in reference to the jurisdiction of the forum state's courts, which in turn is defined in the state's long-arm statute.[138] The scope of both federal and state court jurisdiction is, in other words, a creature of the forum state's law. Moreover, it is the forum state, rather than the state of incorporation, that has the "valid interest in the jurisdictional

---

[133] *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 647 (5th Cir. 2002).

[134] 2017 WL 1476595, *10 (E.D.L.A. 2017).

[135] *Id.* The court applied Louisiana law anyway because it concluded that the result did not differ from the result under Chinese law.

[136] *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 587 (5th Cir. 2010).

[137] *Id.*

[138] *Int'l Bancorp, L.L.C. v. Societe Des Baines De Mer Et Du Cercle Des Etrangers A Monaco*, 192 F. Supp. 2d 467, 477 (E.D. Va. 2002), *aff'd on other grounds sub nom*, *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359 (4th Cir. 2003).

reach of the forum state's court (and, derivatively through Rule 4, Fed. R. Civ. P., the federal courts in that state)."[139] The instant case puts this issue in sharp relief.

The application of foreign law to the jurisdictional issue could cause the substantive law of another nation to abrogate the jurisdictional reach of Louisiana.[140] Because the exercise of personal jurisdiction must comport with the Due Process Clause, this result could also allow foreign law to negate the breadth and scope of the Due Process Clause. In this Court's view, the better approach is to apply the forum state's law to the jurisdiction issue.

Under Louisiana law, the single business enterprise doctrine treats multiple corporate entities as the same entity, including for jurisdictional purposes.[141] The relationship between the corporate entities is not strictly confined to a parent-subsidiary relationship; the entities may be connected to "any related entity if warranted by the facts."[142]

The factors considered by Louisiana courts in determining whether entities constitute a single business enterprise include:

> common ownership, directors and officers, employees, and offices; unified control; inadequate capitalization; noncompliance with corporate formalities; centralized accounting; unclear allocation of profits and losses between corporations; one corporation paying the salaries,

---

[139] *Id.*

[140] As a matter of policy, the practical consequences of allowing other nations to fashion laws that prevent the exercise of jurisdiction by U.S. courts are concerning.

[141] *In re Chinese-Manufactured Drywall Products Liability Litigation*, 2017 WL 1476595, at *33 (E.D. La. 2017).

[142] *Id.* at 19.

expenses, or losses of another corporation; and undocumented transfers of funds between entities. No one factor is dispositive.[143]

The Court finds that Plaintiff has carried its burden to present a *prima facie* case of personal jurisdiction over Alert Asia under a single business enterprise theory.[144] At the 12(b)(2) stage, uncontroverted allegations in the complaint must be taken as true and conflicts between the parties' affidavits must be resolved in the plaintiff's favor.[145] The standard for jurisdictional veil piercing is less stringent than the standard for piercing the corporate veil for liability.[146] Taking each of the factors in order, Plaintiff has sufficiently alleged common ownership through exhibits purporting to show that Allcorn is the sole shareholder and managing director of both Alert Asia and Alert Middle East.[147]

Plaintiff has likewise alleged unified control. Allcorn's affidavit alleges that Alert Asia's governing documents state that "a written resolution signed by a majority of the directors is as valid and effectual as if passed at a formal meeting."[148] Similarly, Alert Middle East's governing documents state that "a decision in writing signed by all members has the same effect as if taken at a General Meeting."[149] Plaintiff stresses the "impotence" of these provisions: Allcorn's alleged status as sole shareholder and director grants him unified control.

---

[143] *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 587 (5th Cir. 2010) (citing *Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 385-89 (5th Cir. 2000); *Green v. Champion Ins. Co.*, 577 So.2d 249, 258 (La. Ct. App. 1 Cir. 1991)).
[144] *Trinity Indus., Inc. v. Myers & Assoc., Ltd.*, 41 F.3d 229, 230–31 (5th Cir. 1995) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985).
[145] *D.J. Inv., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 546 (5th Cir.1985).
[146] *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1161 (5th Cir. 1983).
[147] Rec. Doc. No. 44-2, pp. 2–6; Rec. Doc. 46-3, pp. 1–2; Rec. Doc. No. 47-1, pp. 1–3.
[148] Rec. Doc. No. 44-2, p. 6.
[149] *Id.*

Plaintiff further alleges that Alert Middle East and Alert Asia are based in the same office in Singapore.[150] Allcorn's affidavit rebuts this assertion, stating that each company "operates and conducts" business in different parts of the world.[151] The parties' email chain lends credence to Plaintiff's claim given that Allcorn requested that the name of the contracting party be changed from Alert Asia to Alert Middle East, but did not request that the address be changed from one in Singapore to one in the UAE or Cyprus.[152] This conflict must be resolved in favor of the Plaintiff.[153]

Plaintiff does not allege inadequate capitalization but does allege that the Alert companies do not comply with corporate formalities.[154] Allcorn's affidavit effectively rebuts those accusations,[155] but Plaintiff points out that these formalities are toothless given Allcorn's alleged total control over the companies.[156] Even accepting Plaintiff's argument as to the impotence of the formalities, it does not follow that they are not observed. This factor weighs in favor of Defendants.

Plaintiff does not directly allege centralized accounting, but it does allege that the Alert companies "share the same servers, e-mail account, and website."[157] Allcorn's affidavit does not dispute this claim, instead asserting that the Alert companies share those expenses but pay for them proportionally.[158] Plaintiff's argument is buttressed by

---

[150] Rec. Doc. No. 38, at pp. 1–2.
[151] Rec. Doc. No. 44-2, p. 4.
[152] Rec. Doc. No. 38-1, p. 26.
[153] *D.J. Inv., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 546 (5th Cir.1985).
[154] Rec. Doc. No. 38-1, pp. 6–8.
[155] Alert Middle East, Alert Asia, and other affiliated companies "strictly observe corporate formalities and have separate assets, liabilities, operations and legal existences." Rec. Doc. No. 44-2, p. 4.
[156] Rec. Doc. No. 46, p. 17.
[157] Rec. Doc. No. 38-1, p. 5.
[158] Rec. Doc. No. 44-2, pp. 5–6.

26

the fact that Allcorn communicated with Plaintiff through an email account that did not differentiate between the Alert companies and contained an email signature for Alert Asia.[159] Plaintiff does not allege an unclear allocation of profits and losses between corporations; one corporation paying the salaries, expenses, or losses of another corporation; or undocumented transfers of funds between entities.

Considering Plaintiff's allegations as a whole, and mindful of the 12(b)(2) procedural posture, the Court finds that Plaintiff has sufficiently alleged a single business enterprise theory under Louisiana law for jurisdictional purposes. Plaintiff alleges that the companies are mere alter egos of Allcorn, and the 12(b)(2) evidence submitted supports that claim given the unified control, interchangeable addresses and emails, and apparent lack of other shareholders or directors in any of the Alert companies. Plaintiff has no support as to some of the single business enterprise factors, however, no one factor is dispositive. And at the present procedural posture, where the Court has only now concluded that Defendants are amenable to its authority, Plaintiff has not had the ability to use discovery to obtain evidence to support its claims. Cognizant of that, and in light of the factually supported allegations Plaintiff has levied, the Court concludes that it has personal jurisdiction over Alert Middle East under a single business enterprise theory.[160] Defendants' *Motion to Dismiss* under Rule 12(b)(2) is DENIED.

---

[159] Indeed, based on the exhibits attached to the *Amended Complaint*, the first time Plaintiff knew it was dealing with Alert Middle East rather than Alert Asia was when Allcorn requested that the draft contract be changed to reflect that fact. Even after this, Allcorn continued to use the Alert Asia signature line. Every email Allcorn sent on behalf of Alert Middle East contained the signature line: "Michael E. Allcorn – Managing Director [;] Alert Disaster Control (Asia) PTE. LTD." Every email he sent was from the email address mallcorn@alert.com.sg and included only a Singapore address. See Rec. Doc. No. 38-1.

[160] This is not a conclusion as to Alert Asia's potential liability under a single business enterprise theory.

27

## B.  Improper Service of Process: Rule 12(b)(5) Motion to Dismiss

Defendant moves for dismissal of the *Amended Complaint* under Rule 12(b)(5) for insufficiency of service of process but notes that the issue may be moot.[161] After Defendants filed their *Motions*, Plaintiff filed affidavits of service for both Alert Middle East and Alert Asia.[162] Plaintiff alleges that Allcorn has been intentionally evading service and asks the Court to authorize alternative service.[163] The burden is on Plaintiff to show that service was valid.[164] Plaintiff asserts that service was valid as to Alert Asia under Fed. R. Civ. P. 4(f)(2)(A) and 4(h)(2).[165] Plaintiff asserts that service was valid as to Alert Middle East under Fed. R. Civ. P. 4(f)(1), 4(f)(2)(A), and 4(h)(2), as well as Article 10(c) of the Hague Service Convention.[166]

### 1.  Sufficiency of Service as to Alert Asia

Alert Asia was properly served at its headquarters in Singapore. Fed. R. Civ. P. Rule 4(f)(h)(2) provides that a foreign corporation may be served in any manner prescribed by Rule 4(f). Rule 4(f)(2)(A) provides that "if there is no internationally agreed means" the defendant may be served "by a method reasonably calculated to give notice[] as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction . . .".

---

[161] Rec. Doc. No. 44-1, p. 17; Rec. Doc. No. 53, p. 9.
[162] Rec. Doc. No. 46-1; Rec. Doc. No. 49-1, respectively.
[163] Rec. Doc. No. 46, p. 25.
[164] *Aetna Business Credit, Inc. v. Universal Décor & Interior Design, Inc.*, 635 F.2d 434, 435-36 (5th Cir. 1981); see also *People's United Equip. Fin. Corp. v. Hartmann*, 447 F. App'x 522, 524 (5th Cir. 2011).
[165] Rec. Doc. No. 46, p. 24.
[166] *Id.* at p. 25.

63780

Singapore is not a party to the Hague Service Convention,[167] and the parties have not identified another internationally agreed upon means by which Alert Asia has, or has not, been served. Singapore law authorizes service of process by leaving a copy of the document at the registered or principal office of the corporation.[168] Plaintiff has filed the affidavit of its Singapore process server who attests that he served Alert Asia in the above manner.[169] This service, coupled with the fact that Defendants consider the issue effectively moot, is "evidence satisfying the court that the summons and complaint were delivered to the addressee."[170] Service on Alert Asia was proper.

### 2. *Sufficiency of Service as to Alert Middle East*

Alert Middle East was properly served at its corporate address in Cyprus. Cyprus is a party to the Hague Service Convention.[171] Alert Middle East was served by a Cyprus process server at its registered address in Cyprus, and Alert Middle East's secretary signed the summons as proof of service.[172] This qualifies as service under Fed. R. Civ. P. 4(f)(1) because, under Article 10(c) of the Hague Service Convention, service can be made "directly" by "competent officials in the State of destination." Article 10(c) does not specify a method for establishing proof of

---

[167] See the Hague Conference on Private International Law's list of signatories, accessible at https://www.hcch.net/en/instruments/conventions/status-table/?cid=17.

[168] See Singapore Rules of Court General Order 60, Rule 1–6, accessible at https://sso.agc.gov.sg/SL/322-R5?DocDate=20200729#PO62-pr1-.

[169] See Rec. Doc. Nos. 46-1, 46-2.

[170] Fed. R. Civ. P. 4(l)(2)(B).

[171] See the Hague Conference on Private International Law's list of signatories, accessible at https://www.hcch.net/en/instruments/conventions/status-table/?cid=17.

[172] See Rec. Doc. No. 46-3, p. 10.

63780

service.[173] "In instances in which service is effected abroad and the applicable international agreement allows other means of service, [Fed. R. Civ. P.] 4(l) states that proof of service shall 'include a receipt signed by the addressee or other evidence of delivery to the addressee satisfactory to the court.'"[174] In this case, Alert Middle East's secretary signed a copy of the summons, which has been filed with the Court, so Plaintiff has provided proof of service as to Alert Middle East.[175]

### 3. Insufficiency of Service as to Allcorn

Plaintiff requests that the Court order alternative service pursuant to Fed. R. Civ. P. 4(f)(3). Plaintiff alleges that Allcorn has been intentionally evading service.[176] Defendants deny this.[177] Defendants do not contest that Plaintiff's Singapore process server attempted to serve Allcorn three times to no avail.[178] Additionally, Defendants characterize "any service issues [as] effectively moot."[179]

The Fifth Circuit has not provided an analysis for district courts to follow when considering whether to order alternative service. Other district courts within the Fifth

---

[173] *United States v. Islip*, 22 C.I.T. 852, 864 (1998).
[174] *Id.*
[175] Additionally, Plaintiff effected service under Fed. R. Civ. P. 4(f)(2)(A) by serving Alert Middle East in accordance with the Cyprus Civil Procedure Rules, Order 7, Parts 1–3 and proved service with the signed summons under Fed. R. Civ. P. 4(l)(2)(B).
[176] Rec. Doc. No. 46, p. 25.
[177] Rec. Doc. No. 53, p. 9.
[178] Rec. Doc. No. 46-1 pp. 4–6; Plaintiff's process server also attested that when he served Alert Asia at its registered address in October 2019, he delivered process to a Caucasian man who identified himself as "Mr. Mike" but denied he was Michael Allcorn. The process server later identified Allcorn as "Mr. Mike" based on a photograph of Allcorn. Rec. Doc. 46-1, pp. 4, 19–21.
[179] Rec. Doc. No. 53, p. 9.

63780

Circuit have followed analyses provided by the Ninth and District of Columbia Circuits.[180]

The Ninth Circuit has noted that "[t]he decision whether to allow alternative methods of serving process under Rule 4(f)(3) is committed to the sound discretion of the trial court."[181] The Ninth Circuit has also stated that "court-directed service under Rule 4(f)(3) is as favored as service under Rule 4(f)(1) or Rule 4(f)(2)."[182] District courts have permitted alternative means of service if the plaintiff can establish: "(1) a showing that the plaintiff has reasonably attempted to effectuate service on the defendant, and (2) a showing that the circumstances are such that the court's intervention is necessary."[183] Of course, any method of service must satisfy due process by being "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them the opportunity to present their objections."[184]

Alternative service on Allcorn through his United States-based counsel is appropriate in this case.[185] Plaintiff has attempted to serve him three times at his home address in Singapore without success. Given the international scope of

---

[180] *West v. Rieth, No.* CV 15-2512, 2016 WL 195945, at *2 (E.D. La. Jan. 15, 2016); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. CV 09-02047, 2015 WL 13387769, at *6 (E.D. La. Nov. 9, 2015).

[181] *Brockmeyer v. May*, 383 F.3d 798, 805 (9th Cir. 2004) (internal citations omitted).

[182] *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002).

[183] *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. CV 09-02047, 2015 WL 13387769, at *5 (E.D. La. Nov. 9, 2015) (internal citations omitted). "Imposing such a threshold requirement has been viewed as necessary in order to prevent parties from whimsically seeking alternate means of service and thereby increasing the workload of the courts." *Id.* (internal citations omitted).

[184] *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

[185] In *Nagravision SA v. Gotech Int'l Tech. Ltd.*, 882 F.3d 494, 498 (5th Cir. 2018), the Fifth Circuit affirmed the district court's order of service by email on a nonresident defendant noting that the defendant had not shown that service via email was prohibited by an international agreement.

Allcorn's businesses and his dual residency in the UAE and Singapore,[186] Allcorn's geographical flexibility justifies Plaintiff's difficulties in serving him. Moreover, under the circumstances of this case, where three[187] of Allcorn's businesses have been served, and he is alleged to be personally liable on their behalf, Allcorn has notice of the action pending against him. The fact that all Defendants share one legal team and file jointly bolsters this contention. Moreover, Allcorn has provided an affidavit, which further demonstrates that he has been apprised of the pendency of the action and afforded the opportunity to present his objections.[188] Plaintiff is ordered to serve Allcorn through his United States-based counsel.[189] Defendants' *Motion to Dismiss*[190] under Rule 12(b)(5) is DENIED.

### C.  12(b)(6) Motion to Dismiss

Defendants seek to dismiss Plaintiff's *Amended Complaint*.[191] Plaintiff asserts five causes of action against three defendants, requests multiple remedies, and advances the application of single business enterprise theory.[192]

Plaintiff asserts (1) breach of contract; (2) bad faith breach of contract; (3) fraud; (4) a LUTPA violation; and (5) a suit on an open account as to all Defendants.[193] Plaintiff

---

[186] Rec. Doc. No. 44-2, p. 3.
[187] Alert USA was named in a previous complaint but has since been dismissed.
[188] Rec. Doc. No. 44-2; *Mullane v. Cent. Hanover Bank & Trust* Co., 339 U.S. 306, 314 (1950).
[189] "Service upon a foreign defendant's United States-based counsel is a common form of service under Rule 4(f)(3)." *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. CV 09-02047, 2015 WL 13387769, at *5 (E.D. La. Nov. 9, 2015); "Repeatedly, courts around the country have found that service upon a foreign defendant through counsel is appropriate 'to prevent further delays in litigation.'") (quoting *LG Elecs., Inc. v. Asko Appliances, Inc.*, No. 08–828, 2009 WL 1811098, at *4 (D. Del. June 23, 2009)).
[190] Rec. Doc. No. 44.
[191] Rec. Doc. No. 45-1, p. 8.
[192] Rec. Doc. No. 38, pp. 30–50.
[193] *Id.*

alleges that: Alert Middle East is liable as the contracting party; Allcorn is personally liable in contract and for his fraudulent actions; and Alert Asia is liable for the actions of Allcorn/Alert Middle East under a single business enterprise theory.[194]

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"[195] The Court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[196] "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"[197]

In *Twombly*, the United States Supreme Court set forth the basic criteria necessary for a complaint to survive a Rule 12(b)(6) motion to dismiss. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[198] A complaint is also insufficient if it merely "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[199] However, "[a] claim has facial plausibility when the plaintiff pleads the factual content that allows the court to draw the reasonable inference

---

[194] *Id.* at 30–41.

[195] *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin v. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

[196] *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (internal citations omitted).

[197] *In re Katrina Canal Breaches Litigation*, 495 F.3d at 205 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

[198] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and brackets omitted).

[199] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted) (hereinafter "*Iqbal*").

that the defendant is liable for the misconduct alleged."[200] In order to satisfy the plausibility standard, the plaintiff must show "more than a sheer possibility that the defendant has acted unlawfully."[201] "Furthermore, while the court must accept well-pleaded facts as true, it will not 'strain to find inferences favorable to the plaintiff.'"[202] On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation."[203]

### 1. Breach of Contract

Defendants give short shrift to Plaintiff's breach of contract claim. Defendants' most thorough mention of Plaintiff's breach of contract claim comes in a footnote: "Defendants dispute that any agreement or binding commitment was reached. Instead, although the parties did explore a potential sale opportunity, no agreement was reached, and no commitment was ever made, to sell or purchase the equipment or materials."[204] Plaintiff, on the other hand, cites copiously to the *Amended Complaint* which in turn holds bountiful citations to the parties' alleged email chain.[205] The Court may consider the parties' alleged email chain[206] at the 12(b)(6) stage because it is attached to the *Amended Complaint* and referenced therein.[207]

---

[200] *Id.*
[201] *Id.*
[202] *Taha v. William Marsh Rice Univ.*, 2012 WL 1576099 at *2 (S.D. Tex. 2012) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).
[203] *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).
[204] Rec. Doc. No. 45-1, p. 2, n. 4.
[205] Rec. Doc. No. 47-2, pp. 2–3 (citing Rec. Doc. No. 38, pp. 13–41 (citing Rec. Doc. Nos. 38-1–38-8)).
[206] Attached as Rec. Doc. No. 38-1.
[207] *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011). Defendants do not contest its validity.

34

The facts alleged in the *Amended Complaint* and supported by reference to the uncontroverted email chain could plausibly fit within the hornbook offer–acceptance paradigm. On December 5, 2018, a Plaintiff's representative emailed a "proposal" to Defendants.[208] On December 6, after further communication between the parties, Plaintiff's representative provided Defendants with a draft contract.[209] On December 8, Defendants requested revisions and indicated they would sign the contract after those revisions were made.[210] On December 10, Allcorn/Alert Middle East thanked Plaintiff's representative for sending another revised proposal and contract and stated "[t]he revised Service Quotation and Contract shall be duly signed, scanned, and returned to you immediately upon our arrival at the office in the morning."[211] On December 17, Allcorn/Alert Middle East confirmed the invoices Plaintiff's representative had sent save one issue.[212] Viewed in the light most favorable to Plaintiff, Allcorn/Alert Middle East's statement from a January 29, 2019 email acknowledges that Allcorn/Alert Middle East had an "outstanding account" with Plaintiff: "[p]lease rest assured that we are progressing forward to resolve the outstanding account with ENOC and ultimately with yourselves, as we truly look forward to securing the equipment within our inventory."[213]

---

[208] Rec. Doc. 38-1, p. 5. The term "Defendants" is used loosely here. At this point, Allcorn had been communicating under an Alert email address that did not specify the branch, and his signature said Alert Asia with the Singapore address. He subsequently made it clear to Plaintiff that the contract would be between Alert Middle East and Plaintiff. *Id.* at p. 26. Plaintiff's *Opposition* cites to a significant portion of its *Amended Complaint.* The *Amended Complaint* cites to the vast majority of the email chain, although generally to specific pages. For ease of reference, the Court will cite directly to the email chain.

[209] *Id.* at pp. 11–14.

[210] *Id.* at p. 26. This is the point in time where Allcorn makes it clear that Plaintiff was dealing with Alert Middle East.

[211] *Id.* at p. 79.

[212] Rec. Doc. No. 38-2, p. 6.

[213] Rec. Doc. No. 38-3, p. 15.

Plaintiff has sufficiently alleged a contract existed because the above emails, and others within the chain, could plausibly be a series of offers and counteroffers, and an agreement as to the terms. It also appears that Allcorn/Alert Middle East recognized that respective rights and obligations were agreed upon. Plaintiff further alleges that Allcorn/Middle East never paid on the alleged contract.[214] These two allegations, a purported contract and Allcorn/Alert Middle East's failure to perform under it, are sufficient to carry Plaintiff's breach of contract beyond the 12(b)(6) stage—at least for some of the Defendants.

Plaintiff asserts that Alert Middle East is liable contractually; Allcorn is liable personally, both contractually and as a result of his alleged fraud; and Alert Asia is liable under a single business enterprise theory. The first copy of the draft contract provided that it was between Alert Asia, Allcorn, and Plaintiff.[215] Allcorn/Alert Middle East explicitly requested that the "client name" portion of the contract be amended to read only Alert Middle East.[216] Plaintiff complied, and it was only later versions of the contract that Alert Middle East, through Allcorn, allegedly assented to. This chain of events illustrates two things about the alleged contract: (1) the parties *did not* intend for Allcorn to be contractually liable, and (2) the parties *did* intend for Alert Middle East to be liable. Allcorn cannot be held personally liable under a contract theory as there is a lack of allegations that plausibly establish Plaintiff's contractual privity with Allcorn. Alert Asia's liability under a single business enterprise theory will be discussed below.

---

[214] Rec. Doc. No. 38, p. 27.
[215] Rec. Doc. No. 38-1, pp. 13–15.
[216] *Id.* at p. 26.

36

### 2. *Bad Faith Breach of Contract*

Plaintiff's claim for bad faith breach of contract fails. Plaintiff alleges that Allcorn/Alert Middle East breached in bad faith in three ways: (1) by lying to Plaintiff about the existence of a contract between Alert Middle East and ENOC, (2) by guaranteeing that Alert Middle East would pay for the equipment when it either lacked the ability to pay or did not intend to, and (3) by intentionally refusing to perform under the alleged contract.[217] Defendants counter that Plaintiff's allegation about the non-existence of a contract between Alert Middle East and ENOC is directly contradicted by the signed contract between Alert Middle East and ENOC that Plaintiff filed as an exhibit with the *Amended Complaint.*[218] Defendants further argue that Plaintiff is merely alleging that Allcorn/Alert Middle East breached the contract and that, because Plaintiff does not allege sufficient facts to show that the breach was malicious or fraudulent, Plaintiff has not alleged sufficient facts to support its claim for bad faith breach of contract.[219]

Louisiana Civil Code article 1983 provides, "[c]ontracts must be performed in good faith." The Louisiana Supreme Court has stated:

> [a]n obligor is in bad faith if he intentionally and maliciously fails to perform his obligations. The jurisprudence has consistently held that bad faith as used in the context of La. Civ. Code art. 1997 generally implies actual or constructive fraud or a refusal to fulfill contractual obligations, not an honest mistake as to actual rights or duties. . . .Courts have recognized bad faith is more than mere bad judgment or negligence; it implies the conscious doing of a wrong for dishonest or morally questionable motives.[220]

---

[217] Rec. Doc. No. 47, pp. 10–12.
[218] Rec. Doc. No. 52, p. 3.
[219] Rec. Doc. 45-1, pp. 3–4.
[220] *Castille v. St. Martin Par. Sch. Bd.*, 2016-1028 (La. 3/15/17), 218 So. 3d 52, 56–57.

Plaintiff argues that "[t]hese fraudulent statements [concerning the ENOC contract and Allcorn/Alert Middle East's ability to pay] were made intentionally to induce Plaintiff, a Louisiana company, to enter into the agreement with Alert Middle East . . .".[221] The Court finds plausible Plaintiff's characterization of the statements as occurring before the parties allegedly contracted. Thus, by Plaintiff's allegations, these statements came before the alleged contract was formed and therefore cannot be the basis for a breach of the duty to perform in good faith.[222]

Plaintiff also claims that Allcorn/Alert Middle East breached in bad faith by intentionally choosing not to perform. This allegation falls short of "maliciously" failing to perform. Even if Allcorn/Alert Middle East breached the alleged contract, the simple fact that they did so does not mean they did so in bad faith. The Court is unwilling to allow the appendage of the word "malicious" to a breach of contract claim to establish a cause of action for bad faith breach in the absence of additional factual allegations that "nudge" the "malicious" component across the line from conceivable to plausible.[223] In light of the foregoing, Plaintiff's claims for bad faith breach of contract are dismissed as to all Defendants.

### 3.  Fraud

Turning to Plaintiff's fraud claims, "[t]he elements of a Louisiana delictual fraud or intentional misrepresentation cause of action are: (a) a misrepresentation of a material

---

[221] Rec. Doc. 47, p. 11.

[222] These allegations are more appropriately considered in the context of a fraudulent inducement claim, as Plaintiff alleges below.

[223] *Twombly*, 550 U.S. at 570. Especially since La. Civ. Code. art. 1997 imposes enhanced damages on obligors in bad faith.

38

fact, (b) made with the intent to deceive, and (c) causing justifiable reliance with resultant injury."[224] "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other."[225]

Plaintiff's fraud claims are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b).[226] A party claiming fraud must "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[227] "[T]he pleading requirements of Rule 9(b) may be to some extent relaxed where . . . the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge."[228] "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."[229] "Put simply, Rule 9(b) requires the who, what, when, where, and how to be laid out."[230]

---

[224] *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 627 (5th Cir. 1999); *Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, 527 F.3d 412, 418 (5th Cir. 2008).
[225] La. Civ. Code art. 1953.
[226] *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338–39 (5th Cir.2008) ("state-law fraud claims are subject to the pleading requirements of Rule 9(b)").
[227] Fed. R. Civ. P. 9(b).
[228] *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 385 (5th Cir. 2003) (citing *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 350 (5th Cir.2002)).
[229] *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir.), *opinion modified on denial of reh'g*, 355 F.3d 356 (5th Cir. 2003) (cleaned up).
[230] *Id.*

63780

Plaintiff alleges that Allcorn/Alert Middle East made the following fraudulent statements or intentional misrepresentations: (1) Allcorn/Alert Middle East had a contract with ENOC and (2) Allcorn/Alert Middle East would pay for the equipment.[231]

Plaintiff's claim that Allcorn/Alert Middle East fraudulently told Plaintiff they had a contract with ENOC fails as pled. To be sure, Plaintiff identifies no fewer than nine communications via email and phone on various dates when Allcorn/Alert Middle East allegedly told Plaintiff that Allcorn/Alert Middle East had a contract with ENOC.[232] However, Plaintiff offers nothing from which the Court can draw the reasonable inference that Allcorn/Alert Middle East did not have a contract with ENOC. In fact, the only fact-bearing allegation on the issue is a copy of a signed contract between Allcorn/Alert Middle East and ENOC—which Plaintiff introduced.[233] Plaintiff asserts that this illustrates the depths of Allcorn/Alert Middle East's fraudulent behavior, but offers nothing more than suspicions and bare allegations to disprove the validity of the contract. "Conclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint.[234] Plaintiff's fraud claim under this theory must be dismissed.

Plaintiff claims that Allcorn/Alert Middle East's statements that they intended to perform were fraudulent and enticed Plaintiff to enter into the alleged contract. This is best characterized as a claim for fraudulent inducement, which has the same elements

---

[231] This section of Plaintiff's *Opposition*, like most of it, is lacking in citations to any authorities, much less controlling ones.
[232] Rec. Doc. No. 47, pp. 12–17.
[233] Rec. Doc. No. 38-15, pp. 1–19.
[234] *Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974) (internal citations omitted); *Carter v. Target Corp.*, 541 F. App'x 413, 417 (5th Cir. 2013).

63780

as a basic fraud claim.[235] This claim differs from the bad faith breach of contract claim dismissed above in that this claim centers on Allcorn/Alert Middle East's actions before the parties contracted, rather than Allcorn/Alert Middle East's actions during the performance of the contract. Moreover, this claim is consistent with Plaintiff's alternative theory that Allcorn/Alert Middle East induced Plaintiff to contract with them in the hopes of leveraging that contract into one with ENOC, regardless of whether Allcorn/Alert Middle East accepted the order it placed with Plaintiff.[236]

> Regarding fraudulent inducement, the Fifth Circuit has explained that:
>
> [G]enerally, there is no inference of fraudulent intent not to perform from the mere fact that a promise made is subsequently not performed. However, where substantial nonperformance is coupled with other probative factors, such as where only a short time elapses between the making of the promise and the refusal to perform it, and there is no change in the circumstances, an intent not to perform when the promise was made may, in appropriate circumstances, be properly inferred.[237]

"[T]he requisite intent must be coupled with prompt, substantial nonperformance to demonstrate fraud in the inducement. It must be shown that the defendant promptly followed through on its intent not to perform by substantially failing to carry out its obligations under the contract."[238]

---

[235] A claim for fraudulent inducement is a type of fraud claim. Both emanate from La. Civ. Code art. 1953, and the elements are the same. See *Davis v. Karl*, No. CIV.A. 10-875, 2010 WL 3312587, at *3 (E.D. La. Aug. 19, 2010) and the cases cited therein. *Shelton v. Standard/700 Associates*, 798 So.2d 60, 64 (La. 2001).

[236] Rec. Doc. No. 47, p. 13.

[237] *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 386 (5th Cir.2003) (cleaned up).

[238] *Id.*

41

Defendants argue that this claim is merely one for breach of contract and not cognizable as a fraud action.[239] Plaintiff merely distinguishes the cases Defendants cite without providing further support for its own argument.[240]

Plaintiff's theory and the facts of this case make this a close call. A fraud claim cannot piggyback on a breach of contract claim solely based on an allegation that the alleged contract-breaker never intended to perform; that was Plaintiff's bad faith breach of contract theory. Plaintiff's theory here is slightly different. Here, Plaintiff alleges that Allcorn/Alert Middle East convinced Plaintiff to contract with them based on fraudulent promises of intent to perform. Further, Plaintiff alleges the "plus factors" that the Fifth Circuit has stated support an actionable fraudulent inducement claim in this context.

First, Allcorn/Alert Middle East's nonperformance was prompt. It is difficult to place exactly when Allcorn/Alert Middle East allegedly breached, but they sent a payment timeline on December 7, 2018 that provided for payment to Plaintiff on December 17.[241] Allcorn/Alert Middle East confirmed the validity of the invoices on December 17, and the situation deteriorated from there, eventually culminating in Plaintiff's counsel sending Defendants a demand letter on April 4, 2019.[242]

Second, Allcorn/Alert Middle East's nonperformance was more than "substantial"—it was total. Their only obligation was to pay under the alleged contract, and they failed to do so.

---

[239] Rec. Doc. No 45-1, p. 5; Rec. Doc. No. 52, p. 3.
[240] Rec. Doc. No. 47, pp. 17–18.
[241] Rec. Doc. No. 38-1, p. 20.
[242] Rec. Doc. No. 38-2, p. 6; Rec. Doc. No. 38-9, p. 1–3.

Third, the Fifth Circuit has stated that, in this context, a lack of a change in circumstances is important.[243] Plaintiff asserts ad nauseum that Allcorn/Alert Middle East backed out of the contract because Allcorn/Alert Middle East's contract with ENOC either fell through or never existed, but Plaintiff provides no factual bases for these claims.[244] Defendants, for their part, provide no explanation why Allcorn/Alert Middle East backed out of the order. There are simply no allegations to suggest that there was a change in circumstances between December 2018 and April 2019 that could explain Allcorn/Alert Middle East backing out of the alleged contract. Under the applicable precedent, this leads to the inference that Allcorn/Alert Middle East never intended to perform, as Plaintiff alleges.[245] Of course, were either party to introduce evidence that supports Plaintiff's claims as to the ENOC contract, there would be a change in circumstances that would considerably weaken that inference.

The Court is mindful of the procedural posture of this case. All reasonable inferences must be drawn in favor of the Plaintiff, and the Plaintiff's version of the facts is accepted as true unless entirely unsubstantiated. Plaintiff has alleged that Allcorn/Alert Middle East told Plaintiff that they would perform under a contract, then entirely failed to do so within a short period of time. Because of Plaintiff's complete failure to set forth more than conclusory allegations regarding the ENOC contract, there is no basis to conclude that there was a change of circumstances that would justify Allcorn/Alert Middle East's

---

[243] *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 386 (5th Cir. 2003).
[244] Which is why Plaintiff's other fraud theory failed.
[245] *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375 at 386.

63780

alleged breach. Reading the facts and law generously, the Court finds it plausible that Allcorn/Alert Middle East never intended to perform.

Because it is plausible that if Allcorn/Alert Middle East never intended to perform, representations that they would perform were misrepresentations. The last prong of the fraudulent inducement claim is detrimental reliance, and Plaintiff alleges that it relied on these misrepresentations by contracting with Allcorn/Alert Middle East and producing the equipment Allcorn/Alert Middle East allegedly ordered.[246]

Plaintiff's allegations satisfy the "bare minimum" of Fed. R. Civ. P. 9(b). Plaintiff alleges that Allcorn/Alert Middle East made the misrepresentations regarding intent to perform via email and phone throughout December 2018 and into 2019,[247] and that the reason for doing so was to induce Plaintiff to enter into a contract with Allcorn/Alert Middle East and build the equipment for them.[248] "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally," and Plaintiff makes the requisite allegations.[249] As such, Plaintiff's fraud theory based on Allcorn/Alert Middle East telling Plaintiff they would perform survives the *Motion*.

    4.  *LUTPA*[250]

Plaintiff claims that Defendants violated the LUTPA. Plaintiff asserts that it has standing under the LUTPA as a result of the Louisiana Supreme Court's "holding" in

---

[246] Rec. Doc. No. 38, p. 37; Rec. Doc. No. 38-8, p. 1.
[247] Rec. Doc. No. 38, pp. 15–18; Rec. Doc. No. 38-1, pp. 4, 20–24, 26–27; Rec. Doc. No. 38-2, pp. 6–7.; Rec. Doc. No. 38-3, pp. 15–16.
[248] Rec. Doc. No. 38-11, pp. 3–4; Rec. Doc. No. 38-8, p. 1.
[249] Fed. R. Civ. P. 9(b).
[250] La. R.S. § 51:1401 *et seq.*

44

*Cheramie Services, Inc. v. Shell Deepwater Production, Inc.*[251] However, only three out of seven justices joined the portion of the opinion that addressed LUPTA standing; as such, *Cheramie* is not binding.[252] While the Court will assume for the purposes of this *Ruling* that the plurality opinion in *Cheramie* and subsequent state appellate and federal district court decisions reflect the current state of Louisiana law, some courts have held the opposite.[253]

In many ways, the foregoing fraud analysis obviates the need for a deep dive into the LUTPA. The parties frame the LUTPA argument the same way as the fraud argument; Defendants argue that Fed. R. Civ. P. 9(b) is not satisfied and that the lack of "actionable fraud" forecloses Plaintiff's LUTPA claim.[254] Plaintiff rehashes its arguments in favor of a determination that its fraud claims are plausible.[255]

A majority of the *Cheramie* court agreed:

Louisiana Revised Statutes § 51:1405(A) [(the LUTPA)] prohibits any 'unfair or deceptive acts or practices in the conduct of any trade or commerce . . . .' It has been left to the courts to decide, on a case-by-case basis, what conduct falls within the statute's prohibition…The courts have repeatedly held that, under this statute, the plaintiff must show the alleged conduct

---

[251] Rec. Doc. No. 47, p. 19; 2009-1633 (La. 4/23/10), 35 So.3d 1053.

[252] See *Chaney v. Travelers Ins. Co.*, 249 So. 2d 181, 184 (La. 1971) (holding that Louisiana courts of appeals are not bound by opinion of Louisiana Supreme Court not joined by a majority of the justices).

[253] *Doctor's Hosp. of Slidell, LLC v. United HealthCare Ins. Co.*, No. CV 10-3862, 2011 WL 13213620, at *7 (E.D. La. Apr. 27, 2011) (declining to apply *Cheramie* and instead relying on *Turbos de Acero de Mexico, S.A. v. American International Investment Corp.*, 292 F.3d 471, 480 (5th Cir. 2002) which held the opposite); *Swoboda v. Manders*, No. CV 14-19-SCR, 2015 WL 8493988, at *2 (M.D. La. Dec. 9, 2015), on reconsideration, No. CV 14-19-EWD, 2016 WL 1611477 (M.D. La. Apr. 21, 2016) (holding the same, then reversing on reconsideration).

[254] Rec. Doc. No. 52, p. 4.

[255] Rec. Doc. No. 47, pp. 19–20. Plaintiff primarily relies on an erroneously labeled "Fifth Circuit" case, *Andretti Sports Marketing Louisiana, LLC v. Nola Motorsports Host Committee, Inc*, which was actually an Eastern District of Louisiana case. *Andretti Sports Mktg. Louisiana, LLC v. Nola Motorsports Host Comm.*, Inc., 147 F. Supp. 3d 537, 570 (E.D. La. 2015).

45

"offends established public policy and ... is immoral, unethical, oppressive, unscrupulous, or substantially injurious.[256]

Plaintiff's claim that Allcorn/Alert Middle East defrauded them by stating that they had a contract with ENOC fails for the same reasons as above. Plaintiff offers nothing more than conclusory allegations to suggest that Allcorn/Alert Middle East did not have a contract with ENOC. In fact, Allcorn/Alert Middle East's assertions that there was a contract are buttressed by Plaintiff's introduction of a signed contract between Allcorn/Alert Middle East and ENOC into the record.[257] Plaintiff's LUTPA claim under this theory fails and is dismissed.

Plaintiff's other LUTPA theory is based on the same facts as its fraud in the inducement claim so the preceding analysis is dispositive. Plaintiff has sufficiently alleged that Alert Middle East/Allcorn never intended to perform and that its statements to the contrary were fraudulent. Plaintiff has thus alleged an "element of fraud, misrepresentation, deception or other unethical conduct" sufficient to state a claim for relief under the LUTPA.[258] Defendants' *Motion* is denied as to this theory of recovery under the LUTPA.

### 5. Suit on an Open Account

Plaintiff argues that it has adequately pled a suit on an open account under La. R.S. § 2871, and as such is entitled to attorney's fees if its suit is successful.[259]

---

[256] *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 2009-1633 (La. 4/23/10), 35 So. 3d 1053, 1059–1060.

[257] Rec. Doc. No. 38-15, pp. 1–19.

[258] *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 2009-1633 (La. 4/23/10), 35 So. 3d 1053, 1059–1060 (quoting *Dufau v. Creole Engineering, Inc.*, 465 So.2d 752, 758 (La. App. 5 Cir.), writ denied, 468 So.2d 1207 (La.1985)).

[259] Rec. Doc. No. 47, pp. 21–23.

Defendants argue that this is not a suit on an open account because an open account "requires 'a line of credit [] running and is open to future modification because of the expectations of prospective business dealings [where s]ervices are recurrently granted over a period of time.'"[260] Plaintiffs cite the Louisiana Supreme Court's decision in *Frey Plumbing Co., Inc. v. Foster* for the proposition that "'La. R.S. 9:2781(D)[261] must be applied as written. Under a plain reading of that statute, there is no requirement that there must be one or more transactions between the parties, nor is there any requirement that the parties must anticipate future transactions.'"[262] Plaintiffs point out that *Flavor-Pic Tomato*, quoted by Defendants, relies on a pre-*Frey* Louisiana court of appeal case.[263]

An examination of *Frey* informs the analysis. In *Frey*, the appellate court below held that the plaintiff-plumber's work order was not an open account because either (1) there was only one transaction between the parties and no inclination they intended more or, alternatively, (2) the work order for plumbing services did not fall within the definition of a professional services contract for the purposes of the statute.[264] The Louisiana Supreme Court addressed both arguments with the plain language of the statute, which does not require multiple transactions, anticipated future transactions, or that the account

---

[260] Rec. Doc. No. 45-1, pp. 7–8 (quoting *Flavor-Pic Tomoato Co., Inc. v. Gambino*, 2016 WL 1268359 (E.D. La. March 31, 2016).

[261] Providing the definition of an open account. La. R.S. 9:2781(D) defines an open account as "any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions."

[262] Rec. Doc. No. 47, p. 21 (quoting 2007-1091 (La. 2/26/08); 996 So.2d 969).

[263] Rec. Doc. No. 47, pp. 21–22.

[264] *Frey Plumbing Co. v. Foster*, 2007-1091 (La. 2/26/08), 996 So. 2d 969, 972–73.

47

be for professional services.[265] The court's conclusion that "La. R.S. 9:2781(D) must be applied as written" must be read in context.

The majority of Louisiana courts to examine the issue, both federal and state, have concluded that *Frey* did not create a right to attorney's fees for every breach of contract action.[266] Rather, while *Frey* overruled prior case law that required multiple transactions and/or that the parties anticipate future transactions, it did not affect the basic distinction between an action on an open account and an action on a contract.[267] An open account is characterized by an indeterminacy of a term, especially total price.[268]

Plaintiff argues that an open account exists because Defendants purported to seek a long-term business relationship, Defendants ordered multiple items over several days, and Plaintiff created multiple invoices.[269] These allegations are not sufficient to allege that the account between the parties was an open account. The defining characteristic of an open account, indeterminacy of total price, is absent as is evidenced by the invoices, quotes, and proposals attached to the *Amended Complaint*. Moreover, there is no

---

[265] *Id.* "In summary, we conclude La. R.S. 9:2781(D) must be applied as written. Under a plain reading of that statute, there is no requirement that there must be one or more transactions between the parties, nor is there any requirement that the parties must anticipate future transactions. To the extent the prior case law has imposed any requirements which are inconsistent with the clear language of La. R.S. 9:2781(D), those cases are overruled." *Id.*

[266] *Cong. Square Ltd. P'ship v. Polk*, No. CIV.A. 10-317, 2011 WL 837144, at *4–5 (E.D. La. Mar. 4, 2011); *Shamrock Mgmt., LLC v. GOM Fabricators, LLC*, 2018-0491 (La. App. 1 Cir. 7/10/19), writ denied, 2019-01255 (La. 10/21/19), 280 So. 3d 1171; *Wood Materials LLC v. Berkley Ins. Co.*, No. CV 17-10955, 2018 WL 560473, at *3 (E.D. La. Jan. 24, 2018); *Doerle Food Servs., L.L.C. v. River Valley Foods, L.L.C.*, 52,601 (La. App. 2 Cir. 5/22/19), 273 So. 3d 656, 662, reh'g denied (June 20, 2019), writ denied, 2019-01188 (La. 10/15/19), 280 So. 3d 602.

[267] *Cong. Square Ltd. P'ship*, 2011 WL 837144, at *4–5; *Shamrock Mgmt., LLC*, 280 So. 3d at 1171; *Wood Materials LLC*, 2018 WL 560473, at *3; *Doerle Food Servs., L.L.C.*, 273 So. 3d at 662.

[268] *Cong. Square Ltd. P'ship*, 2011 WL 837144, at *4–5; *Shamrock Mgmt., LLC*, 280 So. 3d at 1171; *Wood Materials LLC*, 2018 WL 560473, at *3; *Doerle Food Servs., L.L.C.*, 273 So. 3d at 662.

[269] Rec. Doc. No. 47, pp. 21–22.

indeterminacy as to any of the terms of the alleged contracts based on the invoices, quotes, and proposals. Plaintiff has failed to allege that this is a suit on an open account, so the claim is dismissed.

Plaintiff alleges that Alert Middle East is liable for the actions of Allcorn/Alert Middle East under a single business enterprise theory.[270] Defendants argue that Plaintiff's required showing is under foreign law.[271] Defendants are correct.

The Fifth Circuit has held that under Louisiana law the state of incorporation governs the determination of whether to pierce the corporate veil.[272] It follows that either Cyprus (Alert Middle East's state of incorporation) or Singapore law (Alert Asia's) controls the analysis. The parties have not provided the Court with the resources necessary for it to rule based on foreign law. Thus, the Court orders supplemental briefing on the choice of law issue and the application of Singapore or Cyprus law, as appropriate, to the single business enterprise theory.

Defendants also seek to dismiss Plaintiff's request of specific performance as a remedy;[273] Plaintiff opposes.[274] In terms of both procedure and discovery, this case is in its infancy, and the Court will defer ruling on remedies until the parties have further developed the facts.

---

[270] Rec. Doc. No. 47, pp. 23–25.
[271] Rec. Doc. No. 44-1, p. 13.
[272] *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 647 (5th Cir. 2002).
[273] Rec. Doc. No. 45-1, pp. 8–9.
[274] Rec. Doc. No. 47, pp. 22–24.

63780

## III.    CONCLUSION

For the reasons set forth above, Defendants' *Motion to Dismiss*[275] under Rule 12(b)(2) and Rule 12(b)(5) is DENIED. Defendants' *Partial Motion to Dismiss*[276] under Rule 12(b)(6) is GRANTED in part and DENIED in part. The Court requests supplemental briefing on: (1) what country's law controls the single business enterprise theory issue, and (2) the application of that law to the facts of this case. Defendants shall have 20 days from the date of this *Ruling* to address these arguments. Plaintiff will have 10 days from the filing of Defendants' supplemental brief to respond. The Parties will attach as exhibits every document referenced therein.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>January 28, 2021</u>.

**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[275] Rec. Doc. No. 44.
[276] Rec. Doc. No. 45.

50

63780